*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VALERIE FENWICK,

        Plaintiff-Appellee,

UNPUBLISHED
October 12, 2023

v

No. 358684
Oakland Circuit Court
LC No. 2019-173257-NH

LOUIS L. SOBOL, M.D., and OAKLAND ENT,
PLC, formerly known as TROY ENT, PLC,

        Defendants-Appellants.

Before: MURRAY, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

In this interlocutory appeal involving the qualification of an expert witness to testify in a medical malpractice dispute, defendants, Louis L. Sobol, M.D. (Dr. Sobol), and Oakland ENT, PLC, formerly known as Troy ENT, PLC (Oakland ENT), appeal by leave granted[1] the trial court's order granting plaintiff's motion to confirm the admissibility of the testimony of her sole expert witness, Dr. Barry Wenig. On appeal, defendants contend that the trial court abused its discretion by ruling that Dr. Wenig was qualified to testify under MCL 600.2169. We reverse the trial court's order and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises from plaintiff's October 2016 medical treatment with Dr. Sobol, a physician and board-certified otolaryngologist (ear, nose, and throat doctor), at Oakland ENT.[2] Plaintiff sought treatment from Dr. Sobol for ongoing pain in her left ear after being treated unsuccessfully for a suspected ear infection at an urgent care facility. Dr. Sobol examined plaintiff and diagnosed her as suffering from otitis externa (inflammation of the outer ear canal) complicated by wax impaction. Dr. Sobol performed a cerumenectomy (removal of earwax) with

---

[1] See *Fenwick v Sobol, MD*, unpublished order of the Court of Appeals, entered March 10, 2022 (Docket No. 358684).

[2] At the time of plaintiff's treatment, Oakland ENT was operating as Troy ENT, PLC.

suction and an otoscope. Following the wax removal, plaintiff suffered continuing pain in her left ear along with vertigo, difficulty hearing, and discharge from the ear. Subsequent examinations by other physicians revealed a perforation of plaintiff's left eardrum and worsening infection. Plaintiff underwent three surgeries and continues to suffer loss of hearing.

Plaintiff filed a medical malpractice claim against defendants in 2019. Plaintiff asserted that Dr. Sobol breached the standard of care when treating her by failing to take a complete medical history and conduct a thorough physical examination, and by performing an earwax-removal procedure that was "unnecessary, inappropriate, and contraindicated" because plaintiff had an atypical ear infection and compromised immune system at the time. Plaintiff asserted that Dr. Sobol's improper treatment directly and proximately caused her to suffer a permanent ear injury requiring multiple corrective surgeries.

Dr. Wenig, also a board-certified otolaryngologist, opined at his deposition that Dr. Sobol breached the standard of care applicable to reasonably prudent otolaryngologists. Dr. Wenig is the chairman of the otolaryngology department and the director of head and neck and robotic surgery at the University of Illinois-Chicago medical school. Dr. Wenig testified at his deposition that he specializes in a distinct subspecialty of otolaryngology—head and neck oncology surgery:

> Q. Okay. Is there a specific area that you will serve as an expert in more often than others, meaning, for example, head and neck oncology surgery or something like that?
>
> A. Yes.
>
> Q. And what is that?
>
> A. Head and neck surgery, which is a fairly broad area, but clearly, as it is my subspecialty and a majority of my practice, most of my testimony is directed to that area.
>
> * * *
>
> Q. Would you agree that within the field of otolaryngology, there are multiple, I guess, subspecialties?
>
> A. Yes, of course.
>
> Q. Some otolaryngologists will practice general ENT, and others will specialize in fields such as yours, which I think is head and neck oncology surgery; is that fair?
>
> A. That's fair.

Dr. Wenig went on to testify that he primarily works with oncology patients and that, since 2012, about 80% of the work he performs involves oncology-related procedures:

Q. And are you even more specialized in head and neck surgery, where the focus of your head and neck surgery practice is in oncology patients?

A. It's primarily in oncology, but I do reconstructions as well, and other types of head and neck surgery, a lot of laryngeal surgery with lasers. I do a very significant number of robotic cases, but the robotic cases are essentially oncologic cases. So I would say about 80 percent of what I do is oncologically [sic] related procedures.

Dr. Wenig testified that he did some general otolaryngology earlier in his career, but since 2012 he primarily concentrated on head and neck oncology surgeries, with only a "small percentage" of his practice devoted to other forms of otolaryngology. Dr. Wenig stated that he performed ear examinations on all his patients and occasionally did earwax removal if incidentally discovered, but this was an aspect of general otolaryngology usually performed by a general otolaryngologist in the department.

Q. In your practice are there general otolaryngologists or would that be a separate department, if you will?

A. No, no, we have two or three general otolaryngologists.

Q. So those two or three general otolaryngologists are the ones that would typically see patients for things like earwax removal or ear infections or things of that sort; is that true?

A. Yeah. I mean if somebody is sent specifically for earwax removal, they would probably wind up seeing a general otolaryngologist. You know, depending on how the—we have a call center, so depending on how the call center directs the call, it could go to one of our otologists as well, but I would say either one of our PAs or one of our general otolaryngologists would see somebody classified as having earwax as a problem.

*  *  *

Q. And fair to say that probably less than 10 percent of your practice overall would deal with those types of patients, or is it even that high?

A. I would say it's probably that high, but it would not be necessarily for ear infections, unless I noted a secondary ear infection to the problem that the patient was sent to me with. But every patient gets, as part of their overall exam, an ear exam as well, and so if there is wax, not specifically seeing me for earwax, but if I incidentally find earwax, we will clean their ears out as well.

Dr. Wenig was also asked how much of his professional time was spent training residents versus clinical practice. He testified:

A. Well, the two overlap quite a bit, because whenever I'm seeing patients, residents are with me. Whenever I'm in the operating room, residents are with me.

We are communicating on a daily basis about our patients. So resident training is built in or baked in to what I do and what we do here in our department.

> Q. And is the vast majority of residents that you train general ENTs?

> A. Well, everyone is trained as a general ENT, and I would say we have a very unique department where we afford our residents the ability to subspecialize when they get done here, as well as to go into practice if they choose to do that. I think statistically we average around 50/50 where people go do subspecialties and practice that subspecialty, and the remaining 50 percent will go into general practice.

Following Dr. Wenig's deposition, plaintiff moved for the trial court to confirm the admissibility of Dr. Wenig's testimony. Plaintiff argued that, while the majority of Dr. Wenig's practice involved head and neck surgical oncology, his sole board-certified specialty was, like Dr. Sobol, in general otolaryngology. Plaintiff further argued that Dr. Wenig is the chair of the otolaryngology department and that the majority of his administrative and instructional time is spent teaching general otolaryngology residents. Accordingly, plaintiff asserted that Dr. Wenig was qualified to testify in the field of general otolaryngology under MCL 600.2169. Plaintiff supported her motion with an undated affidavit from Dr. Wenig in which he averred:

> During the year preceding May 30, 2016, the majority of my administrative and professional time is spent instructing and supervising general Otolaryngology residents, who may then later attend a fellowship at any institution in a subspecialty.

> Although 80% of my surgery now involves Head and Neck Oncology surgery (since December 2012), I have general otolaryngology residents and/or fellows with me during surgery or rounding on patients, at almost all times. The majority of them are general Otolaryngology residents who I supervise and train.

> As I explained at my deposition, at our institution, about 50% of our residents choose to subspecialize, and the remainder go into general practice.

Defendants countered that, because Dr. Wenig did not devote a majority of his professional time to either or both the active clinical practice of general otolaryngology and/or instructing students *in that same specialty* for the year before the alleged malpractice, he was not qualified to testify under MCL 600.2169.

The trial court ultimately concluded that Dr. Wenig was qualified to testify and granted plaintiff's motion, but it provided no substantive reasoning or analysis for its decision. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a trial court's ruling concerning a proposed expert witness's qualifications to testify for an abuse of discretion. *Crego v Edward W Sparrow Hosp Ass'n*, 327 Mich App 525, 529; 937 NW2d 380 (2019). "A trial court abuses its discretion when its decision falls outside the range of principled and reasonable outcomes." *Id.* at 529. This Court reviews de

novo questions of law underlying evidentiary rulings, such as the interpretation of court rules and statutes. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). "If [a statute's] language is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and judicial construction is not permitted." *Nyman v Thomson Reuters Holdings, Inc*, 329 Mich App 539, 544; 942 NW2d 696 (2019).

## III. ANALYSIS

Defendants argue that the trial court abused its discretion by ruling that Dr. Wenig was qualified to testify under MCL 600.2169. According to defendants, Dr. Wenig did not satisfy the qualification requirement under MCL 600.2169(1)(b) because he did not actively practice or instruct students in the same specialty as Dr. Sobol for a majority of Dr. Wenig's professional time during the year before the alleged malpractice. We agree.

To establish a claim of medical malpractice, a party must present evidence via expert testimony of the relevant standard of care. See *Gay v Select Specialty Hosp*, 295 Mich App 284, 292; 813 NW2d 354 (2012). "A physician who testifies regarding the standard of care at issue must satisfy the requirements of MCL 600.2169(1)." *Rock v Crocker*, 499 Mich 247, 260; 884 NW2d 227 (2016).

MCL 600.2169(1) provides, as relevant here:

In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted *a majority* of his or her professional time to *either or both* of the following:

(*i*) The *active clinical practice of the same health profession* in which the party against whom or on whose behalf the testimony is offered is licensed and, *if that party is a specialist, the active clinical practice of that specialty.*

(*ii*) The *instruction of students* in an accredited health professional school or accredited residency or clinical research program *in the same health profession* in which the party against whom or on whose behalf the testimony is offered is licensed and, *if that party is a specialist*, an accredited health professional school or accredited residency or clinical research program *in the same specialty*. [Emphasis added.]

-5-

"The proponent of expert testimony in a medical malpractice case must satisfy the court that the expert is qualified under . . . MCL 600.2169." *Elher*, 499 Mich at 22 (footnote and citation omitted). "MCL 600.2169(1)(b) . . . requires a proposed expert physician to spend greater than 50 percent of his or her professional time practicing [and/or teaching] the relevant specialty the year before the alleged malpractice." *Kiefer v Markley*, 283 Mich App 555, 559; 769 NW2d 271 (2009).

In *Woodard v Custer*, 476 Mich 545; 719 NW2d 842 (2006), our Supreme Court explained that MCL 600.2169(1) "requires the matching of a singular specialty, not multiple specialties." *Id.* at 559. After taking note of the practice and/or teaching requirement in MCL 600.2169(1)(b), the *Woodard* Court stated:

> Obviously, a specialist can only devote a *majority* of his professional time to *one* specialty. Therefore, it is clear that § 2169(1) only requires the plaintiff's expert to match one of the defendant physician's specialties. Because the plaintiff's expert will be providing expert testimony on the appropriate or relevant standard of practice or care, not an inappropriate or irrelevant standard of practice or care, it follows that the plaintiff's expert witness must match the one most relevant standard of practice or care—the specialty engaged in by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty. [*Id.* at 560.]

"[A] 'specialty' is a particular branch of medicine or surgery in which one can potentially become board certified." *Id.* at 561.

> [A] 'subspecialty' is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action. [*Id.* at 562 (footnote omitted).]

The *Woodard* Court also provided the following explanation concerning the practice and/or teaching requirement in MCL 600.2169(1)(b):

> As we explained above, one cannot devote a "majority" of one's professional time to more than one specialty. Therefore, in order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the same specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. [*Id.* at 566 (footnote omitted).]

The Court explained further:

> Just as a subspecialty is a specialty within the meaning of §2169(1)(a), a subspecialty is a specialty within the meaning of §2169(1)(b). Therefore, if the

defendant physician specializes in a subspecialty and was doing so at the time of the alleged malpractice, the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching that subspecialty. [*Id*. at 566 n 12.]

For these reasons, "the plaintiff's expert does not have to match all of the defendant physician's specialties; rather, the plaintiff's expert only has to match the one most relevant specialty." *Id*. at 567-568.

As relevant here, in *Hamilton v Kuligowski*, the companion case in *Woodard*, the Court affirmed that the plaintiff's expert, although board certified in general internal medicine like the defendant physician, did not meet the practice and/or teaching requirement of MCL 600.2169(1)(b) because he (1) spent a majority of his professional time during the relevant period treating infectious diseases, a subspecialty of the one most relevant specialty of general internal medicine, and (2) he acknowledged not knowing " 'what the average internist sees day in and day out.' " *Id*. at 556, 577-578.

As an initial matter, we disagree with plaintiff's contention that the language in *Woodard* stating that a specialist can only devote a majority of his or her professional time to one specialty is dicta. "Unlike holdings, [o]biter dicta are not binding precedent. Instead, they are statements that are unnecessary to determine the case at hand and, thus, lack the force of an adjudication." *Estate of Pearce v Eaton Co Rd Comm*, 507 Mich 183, 197; 968 NW2d 323 (2021) (quotation marks and citation omitted; alteration in original). The language challenged as dicta, which the *Woodard* Court provided twice in its majority opinion, was necessary to determine the case. The statements were provided within an extensive analysis and interpretation of MCL 600.2169(1), including MCL 600.2169(1)(b), with subdivision (1)(b) explicitly applied in resolving the facts of the case. Indeed, the language was critical to the Court's conclusion that a plaintiff's expert is required to match only the relevant specialty in a given case, and to devote a majority of his or her professional time to that one most relevant specialty.

We further disagree with plaintiff that the portion of *Woodard* that plaintiff calls dicta is "incorrect." We agree with plaintiff to the extent she argues that MCL 600.2169(1)(b) envisions that an expert can both practice and teach a given specialty during a period of time. Indeed, this is plainly envisioned by the statutory language stating that an expert must have spent a majority of his or her professional time "either or both" practicing or teaching in the relevant specialty. MCL 600.2169(1)(b). But an expert cannot spend a *majority* of his or her professional time practicing one specialty while simultaneously spending a *majority* of his or her professional time teaching another, particularly given the earlier-discussed language from *Woodard*.

Here, Dr. Wenig testified that he subspecialized and spent the majority—specifically, about 80%—of his practice in head and neck oncology surgery. While Dr. Wenig testified that he performed ear examinations on all his patients, occasionally did earwax removal if incidentally discovered during treatment, and regularly trained residents on ear-cleaning, he acknowledged that only 10% of his professional time was devoted to general otolaryngology. From this testimony, the only reasonable conclusion is that Dr. Wenig spent a majority of his professional time practicing head and neck oncology, not general otolaryngology.

Plaintiff insists that, based on Dr. Wenig's affidavit, he satisfies MCL 600.2169(1)(b)(*ii*) "because a majority of his professional time is spent teaching general ENT residents." In effect, plaintiff argues that it does not matter *what* Dr. Wenig taught during that time but to *whom* he taught it. Indeed, this would be the only way in which Dr. Wenig's affidavit could satisfy MCL 600.2169(1)(b)(*ii*) because Dr. Wenig never averred in that affidavit that he taught general otolaryngology to residents, only that he taught general otolaryngology residents. But *Woodard* makes clear that MCL 600.2169(1)(b)(*ii*) is satisfied if, during the past year, the expert spent a majority of his or her professional time "teaching the same specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty." *Woodard*, 476 Mich at 566. Again, Dr. Wenig testified that the vast majority of his practice was devoted to head and neck oncology surgery, not general otolaryngology. Thus, even if general otolaryngology residents were present and being instructed during most of Dr. Wenig's practice, this instruction was primarily in head and neck oncology surgery, not general otolaryngology. Accordingly, Dr. Wenig's affidavit does not establish that he is qualified as an expert under MCL 600.2169(1)(b)(*ii*).[3]

For the foregoing reasons, the record plainly establishes that a majority of Dr. Wenig's professional time in the year before the alleged malpractice was not spent either practicing or instructing students in general otolaryngology, the relevant specialty here. Therefore, the trial court abused its discretion by ruling that Dr. Wenig was qualified to testify under MCL 600.2169.

Reversed and remanded. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

---

[3] Plaintiff also argues that MCL 600.2169 violates the separation of powers under the Michigan Constitution. However, a majority of our Supreme Court already rejected this argument in *McDougall v Schanz*, 461 Mich 15, 37; 597 NW2d 148 (1999). Being bound by *McDougall*, we need not address this issue further.